**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In re: Case No. 26-03127- swd

SUNSET PROPERTIES, LLC, Chapter 11

Debtor. Hon. Scott W. Dales
_________________________________/

**DECLARATION OF MATTHEW J. SCHMIDT IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

In support of the above-captioned Debtor's Chapter 11 Petition and its First Day Motions (defined below), I, Matthew J. Schmidt, declare as follows:

1. I am the manager of Sunset Properties, LLC (the "Debtor"), a Delaware limited liability company, with its principal place of business at 850 N. DuPage Ave., Ste. 3, Lombard, IL 60114.

2. Debtor is wholly owned by Bridgman Michigan, LLC (the "Parent"), an Illinois limited liability company.

3. Debtor owns three apartment complexes in Bridgman, Michigan located at the following addresses:

a. 4812 Lake St., Bridgman, Michigan;

b. 9632 Clark St., Bridgman, Michigan; and

c. 9587 Red Arrow Hwy., Bridgman, Michigan

(collectively, the "Real Estate").

4. As part of a refinancing of the Real Estate with Sabal Capital II, LLC ("Sabal") in 2022, the Parent established Debtor and transferred the Real Estate to Debtor.

5. In August 2025, Debtor's proposed take out lender obtained an appraisal of the Real Estate, which valued the Real Estate at $11,150,000.

6. The Real Estate is managed under a management contract by Debtor's affiliate, Earned Run Property Management, LLC.

7. Debtor filed for bankruptcy protection under Chapter 11 of the United States Code (the "Bankruptcy Code") on October 1, 2026 (the "Petition Date").

8. I am responsible for devising and implementing Debtor's business plans and strategies, overseeing Debtor's finances and operational and legal affairs, and supervising the maintenance of its books and records. I have been involved in Debtor's restructuring process (the "Restructuring Process"), which includes (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring (ii) managing professionals engaged by Debtor in connection with the Restructuring Process, and (iii) supervising the preparation of documentation needed to implement the Restructuring Process.

9. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with Debtor's personnel and professionals, my knowledge and review of relevant documents

including Debtor's books and records, and my opinions based on my experience, knowledge, and information concerning Debtor's operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

10. Debtor has requested certain relief in "first day" motions filed with the Court (collectively, the "First Day Motions") in order to minimize potential adverse effects of the bankruptcy filings and to maximize the value of the estate. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of this Chapter 11 case and in support of Debtor's voluntary petition and First Day Motions.

11. I believe the relief sought in each of the First Day Motions (i) is necessary for Debtor to make a successful transition to and reorganize, in Chapter 11 with minimal interruption or disruption to its business, and (ii) serves to help maximize and preserve the value of Debtor's estate.

## CAUSES OF BANKRUPTCY FILING

12. This entire bankruptcy case turns on a single issue -- how much is Computershare Trust Company's (the "Lender") enforceable claim. Debtor has been trying to understand what Lender thinks it is owed and how it arrived at its calculations for over one year and seven months and still does not have the answer to this question.

13. On or about July 15, 2022, Debtor entered into a loan agreement with Sabal (the "Loan Agreement") and according to Lender, Sable assigned its rights under the Loan Agreement and related documents to Lender. Under the Loan Agreement, Lender loaned $6,350,000 to Debtor secured by Debtor's real estate consisting of three apartment complexes (the "Loan").

14. The apartment complexes have been historically successful, maintaining a high occupancy rate of at least 93% (currently 97%), and have consistently generated profits and excess cash flow after payment of expenses and debt service.

15. However, in the fall of 2024, an affiliated Florida project with a different lender suffered two back to back devastating hurricanes just 10 days apart - - first Hurricane Helene and then Hurricane Milton. To save that project from even greater destruction, Debtor temporarily loaned funds for emergency repairs resulting in Debtor falling behind several payments to Lender.

16. Since the Loan began in 2022, Lender operated, maintained and provided an on online portal ("Portal") so that Debtor could see the exact amount due to Lender at any time. The Portal also showed the date and amount of the next loan payment required to be made. For example, a payment due on February 6, 2025 would appear as payable in the Portal shortly following the deadline for the previous payment due on January 6, 2025. Accordingly, Debtor understood and reasonably

expected amount due on March 6, 2025 would appear in the Portal as payable shortly following the deadline for the previous payment due on February 6, 2025.

17. In early 2025, I verified with Lender -- using the exact mechanism Lender provided -- the amount Debtor owed and immediately paid everything Lender claimed was due.

18. After the emergency repairs were completed following the back to back hurricanes, the funds were repaid to Debtor and Debtor made all of its required payments to Lender, including a payment of $49,000 to Lender on January 25, 2025.

19. Less than two weeks later the I checked the Portal and confirmed that $112,719.44 was the required payment in order to make Debtor fully current at that time. So on February 18, 2025, Debtor paid that entire $112,719.44.

20. Even though the Portal showed that Lender was paid current with Debtor's $112,719.44 payment on February 18, 2025, Lender wrongfully sent a notice of default and right to cure letter eight days later to Debtor on February 26, 2025 (the "Alleged Default and Cure Letter"; Exhibit B to the Cash Collateral Motion). The Alleged Default and Cure Letter wrongfully claimed that the monthly payments for December 2024, January 2025 and February 2025 had not been made - - without stating those amounts or their totals - - and gave Debtor 5 days to cure this alleged default.

21. As soon as Debtor received the Alleged Default and Cure Letter, I tried to check the Portal to confirm that it was current after paying the $112,719.44 on February 18, 2025 and that no previous monthly payments remained outstanding as Lender claimed. But for the first time since the Loan was made in July of 2022, the Portal had been shut off so that Debtor could not view why Lender claimed a default and why it sent the Alleged Default and Cure Letter.

22. Because I was worried when it received the Alleged Default and Cure Letter, Debtor promptly hired counsel who promptly immediately wrote to Lender's counsel on February 26, 2025 explaining that all amounts due had been paid, and requesting that Lender provide a breakdown of how the amounts of $112,719.44 paid on February 18, 2025 and another $49,000 paid on January 25, 2025 were applied to Debtor's account.

23. On February 27, 2025 - - the very next day after the Alleged Default and Cure Letter - - Lender admitted that it had received the $112,719.44 but that the payment was "placed in suspense" and only afterwords applied to the December 2024 and January 2025 payments as well as some other expenses. Lender then claimed that the $112,719.44 did not cure the February 2025 payment but again refused to identify the alleged amount it claimed due. Neither did the Alleged Default Letter even mention - - let alone apply - - the $49,000 payment Debtor made

on January 25, 2025. In fact, Lender admitted that it lost this $49,000 payment, so Debtor went ahead and sent proof of payment.

24. Even after the Portal showed that Debtor was current after Lender received the $112,719.44 payment on February 18, 2025 and after it received - - and then lost - - Debtor's $49,000 payment on January 25, 2025 -–– the Lender still never acknowledged that Debtor cured its default or showed how these funds had been applied to Debtor's account, and never withdrew its now established wrongful Alleged Default and Cure Letter.

25. At first. I assumed that Lender's behavior was nothing more than a series of unintentional processing errors by a very large bureaucracy. Although frustrated that Lender could not verify that Debtor was current, I desired to reconcile any discrepancies with Lender to get the relationship back on track and continue paying off the Loan in the normal course.

26. Over the next several months, counsel for Debtor and counsel for Lender exchanged dozens and dozens and dozens of emails (Exhibit C to the Cash Collateral Motion). In those emails, Debtor repeatedly attempted -- patiently and in good faith -- to obtain an accounting from Lender of any amounts allegedly due on the date of the Alleged Default and Cure Letter. In fact, Debtor sent no less than 43 emails between February 26, 2025 and August 2025 asking for a reconciliation so

that Debtor could understand what amount, if any, Lender still claimed was unpaid at the time of its Alleged Default and Cure Letter.

27. To this day, Lender has refused to provide such a reconciliation or re-open the Portal, and instead went ahead and sued Debtor to, among other things, appoint a receiver and foreclose on Debtor's property. During the lawsuit, Debtor repeatedly attempted in good faith to settle but the Lender refused to engage.

28. During the same period of time, Debtor also made at least 12 requests for simple phone calls with Lender's servicer attempting to discuss the account and resolve any questions or disputes. The servicer refused to even get on the phone even once for this purpose.

29. Instead of responding to Debtor's continuous requests to discuss the account, resolve any discrepancies and discuss reinstatement, Lender made twelve demands for more information and/or documentation from Debtor before filing a lawsuit and multiple more demands after filing the lawsuit, allegedly in order for Lender to consider whether it would pick up the phone to have a conversation, provide the math behind the summary numbers provided with no calculations, and make a good faith attempt to reconcile and/or resolve its disputes with Debtor.

30. Debtor responded by promptly providing the requested information and/or documentation hoping that Lender was acting in good faith. Unfortunately - - and now in retrospect - - Debtor's hope was misplaced. Lender kept asking for

more and more information from Debtor before Lender said it would even consider engaging in any conversations with Debtor. Debtor kept complying but Lender kept refusing to engage.

31. After Debtor spent tens of thousands of dollars on its counsel begging Lender to engage and never once agreeing to a phone call to reconcile the account, Lender filed an aggressive action in the Berrien County Circuit Court (the "State Court Action") to enforce its Loan Agreement, pretending that any reconciliation of the amount due is "irrelevant" because Debtor allegedly missed a payment December 6, 2024.

32. While the State Court Action was pending Debtor requested mediation and the court agreed to appoint a mediator. Just as it delayed providing an accounting of the calculations of its claim to Debtor for months and months, Lender likewise delayed the mediation process by refusing to make a settlement proposal until Debtor provided "make work" and other voluminous documents that had no relevance to the issues being negotiated.

33. Based on Lender's historical refusal to engage in any good faith dialogue, Debtor was understandably hesitant to again engage once again in a senseless and expensive exercise. The mediator advised that he believed that Lender's bureaucracy required the Lender to "check the box" that it had certain information it required before making an offer. So, Debtor followed the meditator's

advice and provided the requested information hoping this time that Lender would reasonably engage and provide the promised proposal and try to settle the case.

34. The mediation was delayed several times so that the Lender could put together its response to Debtor's proposal made multiple months earlier, each delay costing Debtor more money in attorneys' fees

35. Finally, after several months and significant legal expense, Lender provided only summary numbers of the amount it claimed due -- which was hundreds of thousands of dollars more than it previously claimed -- and then offered but a nominal discount from this newly increased claim.

36. The mediator requested that Lender provide its mechanism for this new calculation and its supporting math but Lender told the mediator that it did not have this information. Accordingly, the mediation was adjourned once again so that Lender could put its detailed numbers together.

37. After more adjournments, and more legal expense, the Lender failed to ever explain its own calculations and the mediator canceled any further mediation.

38. To this day, Lender has yet to provide its math to support its claim. So Debtor has now filed a bar date motion to require the Lender to provide what it should have been providing since it wrongfully sent its Alleged Default and Curer Letter on February 26, 2025 – well over 1 year and 7 months ago.

39. Based on the little information provided to date in summary fashion and bereft of any supporting calculations, Lender seeks over $3,000,000 in total fees, costs and penalties, all as a direct result of Lender's wrongful acceleration of its debt.

40. Included in this $3,000,000 is over $2,000,000 of a pre-payment penalty.

41. Lender's original loan to Debtor in 2022 was $6,350,000.

## NATURE OF DEBT

42. A copy of the State of Delaware's report of filings under the Uniform Commercial Code ("UCC") dated August 29, 2025, is attached as Exhibit C to the Cash Collateral Motion, which reflects the UCC-1 filings filed against Debtor.

43. Upon information and belief, Lender may assert a first priority security interest, mortgage, and assignment of rents in substantially all of Debtor's assets in an amount equal to $9,844,643.04[1].

44. In addition to its security interest in Debtor's Cash Collateral, upon information and belief, Lender also asserts a first priority mortgage in Debtor's Real Estate.

45. Upon information and belief, no other party-in-interest asserts a perfected interest in Debtor's Cash Collateral.

[1] As of April 6, 2026, according to Lender.

46. Nothing in this Declaration may be construed as an admission by Debtor as to any liability or the amount of any indebtedness, or as an admission by Debtor with respect to the validity, extent, priority, and/or enforceability of any lien against any of Debtor's assets.

## REQUEST FOR USE OF CASH COLLATERAL

47. Contemporaneously with the filing of this Declaration, Debtor has filed its *Motion for Entry of an Order Authorizing Debtor to Use Cash Collateral and Granting Adequate Protection* (the "Cash Collateral Motion").

48. As of the Petition Date, Debtor, without admission, believes that its cash collateral, as defined in 11 U.S.C. §363, (the "Cash Collateral") consisted of the following collateral:

i. Cash in bank of approximately $7,247.50;
ii. Cash in Schafer and Weiner client trust account $303,408.72 and
iii. Unpaid rents of $17,221[2]

49. Debtor requires the use of Cash Collateral to make such payments as are necessary for the continuation of its business as shown in the budget attached hereto as Exhibit B to the Cash Collateral Motion (the "Budget").

[2] Consisting of $5,295 owed by current tenants and $11,926 owed by former tenants. Debtor does not anticipate collecting any amount from former tenants.

50. The Budget projects Debtor's anticipated revenue and expenses and reflects the amount of funds Debtor must spend on its operations over the three month period. The projected revenue and expenses in the Budget are based upon historical financial data.

51. Over the course of the three month period, Debtor expects to generate net cash flow of over $30,000. Id.

52. As shown in the Budget, Debtor must be authorized to use $136,959.13 of Cash Collateral to avoid immediate and irreparable harm before the date of the final hearing or the date this Order becomes a final order (which Debtor assumes is thirty (30) days of Cash Collateral usage).

53. Without the ability to make the payments as set forth in the Budget, Debtor will be unable to reorganize in Chapter 11 and will be forced to shut down. The majority of Debtor's value arises from the value of its Real Estate. If Debtor is unable to operate within the Chapter 11 environment, Debtor's value will be destroyed. Accordingly, authorizing Debtor to use Cash Collateral as set forth in the Budget is in the best interests of all creditors and parties-in-interest.

## **BAR DATE MOTION**

54. On October 2, 2026, Debtor filed its Plan of Reorganization and Disclosure Statement [Docket Nos. 6 and 7].

55. Based on Debtor's unsuccessful history of asking Lender to detail its claim with actual calculations, an order requiring Lender to do so by filing a detailed proof of claim, including attaching all documents supporting its claim and all calculations used to arrive at that claim amount, will expedite the claims allowance process and expedite the Chapter 11 confirmation process of Debtor's filed Plan of Reorganization.

56. Requiring Lender's claim to be filed within twenty-one (21) days allows this central issue to be resolved expeditiously, and will allow for the confirmation of Debtor's Plan of Reorganization filed October 2, 2026.

## LEASE ASSUMPTION MOTION

57. As part of its business operations, Debtor leases (each individually a "Lease", and collectively the "Residential Leases") apartments to residents living at the Real Estate (the "Tenants").

58. A list of Tenants whose Leases are to be assumed is attached as Exhibit B to the Lease Assumption Motion (the "Tenant List"), and the sample lease is attached as Exhibit C to the Lease Assumption Motion (the "Sample Lease").

59. Each Residential Lease is substantially in the form of the Master Lease.

60. The Residential Leases are comprised of 104 individual apartment Leases.

61. Each Lease runs for a set duration after which it continues month-to-month unless terminated in writing by either party. Master Lease, page 1, Section 1.2.

62. To terminate a Lease, a Tenant must provide Debtor written notice of intent to terminate at least thirty (30) days prior to a vacation date. Master Lease, page 7, Section 4.3.

63. No Tenant on the Tenant List has provided written notice of intent to terminate a Lease as of the date of this Motion.

64. Debtor is not in default on any Lease and accordingly no cure amounts are due to any Tenant.

65. The 104 Residential Leases generate substantial rental income for Debtor (the "Rental Income") and in 2025 generated roughly $1.3 million in gross rental income. See Exhibit D to the Lease Assumption Motion. (Debtor's 2025 Income Statement).

66. The Rental Income generated by the Residential Leases is critical to Debtor's successful reorganization and will allow Debtor to remain in possession of its business and confirm its filed Chapter 11 Plan of Reorganization.

Declarant says nothing further.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/ s / Matthew J. Schmidt*
Matthew J. Schmidt

Dated: October 5, 2025